

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2006 SEP -1 P 3: 12
LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSE HOLMES, JR. | *   CIVIL ACTION |
| PLAINTIFF | *   NUMBER: 06 - 5695 |
| VERSUS | *   SECT. __.  MAG. ____ |
| CITY OF NEW ORLEANS, MAYOR C.  RAY NAGIN, FORMER NOPD SUPERINTENDENT EDDIE COMPASS, FORMER NOPD DEPUTY CHIEF WARREN RILEY, NOPD CAPTAINS ROBERT BARDY AND JOHN BRYSON, NOPD LT. M. LOHMAN, SGT. KENNETH BOWEN, SGT. ROBERT GISEVIUS, OFFICER ROBERT FAULCON, OFFICER MICHAEL HUNTER, OFFICER IGNATIUS HILLS, OFFICER ANTHONY VILLAVASO AND OFFICER ROBERT BARRIOS, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AS NEW ORLEANS POLICE OFFICERS AND JOHN DOES 1-5 AND DEPUTY DAVID RYDER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A DEPUTY SHERIFF WITH THE ST. LANDRY PARISH SHERIFF'S OFFICE | *   SECT. A MAG. 1<br><br>*<br>*<br>*<br><br>*<br><br>*   CIVIL RIGHTS UNDER<br>    42 U.S.C. 1983 AND 1988<br>*<br>*   JURY TRIAL REQUESTED<br>*<br><br>* |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **COMPLAINT**

-1-

Fee $350.°°
✓ Process____
X  Dktd ____
__ CtRmDep____
__ Doc. No____

## I.    JURISDICTION

1.    This action is brought pursuant to 42 U.S.C. 1983 and 1988. Jurisdiction is founded on 28 U.S.C. Section 1331 and 1343, the First, Fourth, Ninth and Fourteenth Amendments to the Constitution of the United States. Supplemental jurisdiction over claims under state constitutional and statutory law is also invoked. A jury trial is requested.

## II.    PARTY PLAINTIFF

2.    Plaintiff Jose Holmes, Jr. is a person of the full age of majority. He is domiciled in Atlanta, Georgia.

## III.    PARTY DEFENDANTS

3.    Defendant City of New Orleans (City) made a defendant herein, is a political subdivision of the State of Louisiana and a municipal corporation, which was at all relevant times the employer of the defendant, New Orleans Police Department (NOPD) personnel named as defendants herein. Defendant, City, is directly liable for the acts complained of herein due to the policies, practices, procedures and customs of its police department and its employees. It is also responsible for the hiring, training, supervision, discipline and control of the defendant NOPD personnel named as defendants herein as well as other unnamed police employees and supervisors who had responsibility for the acts and omissions described herein. Defendant City is also vicariously liable for the actions of its employees as described herein, under state law.

4.     Defendant C. Ray Nagin is a person of the full age of majority and is a resident of the Eastern District of Louisiana. At all times pertinent herein, he was the duly elected Mayor of the City of New Orleans. Defendant Nagin was responsible for the supervision, administration, policies, practices, procedures and customs for the City of New Orleans and its police department, as further described herein. He was responsible to see that the safety and security of the City, its residents and visitors, property and pets, were protected in the event of a major hurricane event. He was responsible for the hiring, training, discipline, supervision and control of the NOPD chiefs, supervisors and officers who are defendants herein, including defendants then Superintendent Eddie Compass and then Deputy Chief Warren Riley. He was a final policymaker. He is sued individually and in his official capacity as the Mayor of the City of New Orleans.

5.     Defendant Eddie Compass was the Superintendent of Police for the City of New Orleans at all pertinent times herein. He was responsible for the policies, practices, customs and procedures of the NOPD, as well as the hiring, training, supervision, discipline and control of police personnel under his command which includes the NOPD defendants named and referenced herein. He is of the full age of majority and upon information and belief a resident of the Eastern District of Louisiana. He is sued in his individual and official capacity. At all pertinent times herein he was acting under color of law and in the course and scope of his employment with the City of New Orleans. He was a final policymaker for the City

-3-

of New Orleans relating to police practices, policies, customs and procedures.

6.      Defendant, Chief Warren Riley, was Deputy Chief of the New Orleans Police Department, employed by the City of New Orleans at all pertinent times herein.  He was responsible for the operations and implementation of policies, practices, customs and procedures of the NOPD, as well as the hiring, training, supervision, discipline and control of police personnel under his command which includes the NOPD defendants named and referenced herein as well as other unnamed police employees who had responsibility for the acts and omissions described herein. He is of the full age of majority and upon information and belief a resident of the Eastern District of Louisiana. He is sued in his individual and official capacity. At all pertinent times herein he was acting under color of law and in the course and scope of his employment with the City of New Orleans. He was a final policymaker for the City of New Orleans relating to police practices, policies, customs and procedures.

7.      Defendants, Robert Barrios, Ignatius Hills, Mike Hunter, Anthony Villaraso, and Robert Faulcon are persons of the full age of majority and on information and belief residents of the Eastern District of Louisiana.  At all pertinent times herein, they were acting under color of state law and in the course and scope of their employment with the City of New Orleans.  They are sued in their individual and official capacities.

8.      Defendants, NOPD Sergeants Kenny Bowen, Robert Gisevius and

Arthur Kaufman, are all persons of the full age of majority and upon information and belief residents of the Eastern District of Louisiana. At all pertinent times herein, in addition to being responsible for their own actions, Sgts. Bowen, Gisevius and Kaufman were responsible for supervision, monitoring, training, discipline, control and oversight of the activities of defendants, Barrios, Hills, Hunter, Villaraso and Faulcon, as well as John Does 1-5 and other NOPD officers and employees involved herein. At all times pertinent herein, the defendant, NOPD Sergeants, were acting under color of law and in the course and scope of their employment with the City of New Orleans. Sgts. Bowen, Gisevius and Kaufman are sued in their individual and official capacities.

9.    Defendants John Does 1-5 are persons of the full age of majority and, upon information and belief, residents of the Eastern District of Louisiana. At all pertinent times herein defendants John Does 1-5 were acting under color of law and in the course and scope of their employment with the City of New Orleans.  John Does 1-5 are sued in their individual and official capacities.

10.    The identities of defendant John Does 1-5 are currently unknown to the plaintiff despite diligent efforts to ascertain their identities. Each of these defendants is well aware of their own acts and omissions in this matter, as are the other named defendants and their identities are known to the City of New Orleans and the command and supervisory defendants named herein.

11.    Defendant, NOPD Lt. M. Lohman, is a person of the full age of majority

and upon information and belief a resident of the Eastern District of Louisiana. At all pertinent times herein, Lt. Lohman was responsible for supervision, monitoring, training, discipline, control and oversight of the activities of defendants Barrios, Hills, Hunter, Villaraso, Faulcon and Sgts. Bowen, Gisevius and Kaufman, as well as John Does 1-5 and other NOPD officers and employees involved herein. At all times pertinent herein, Lt. Lohman was acting under color of law and in the course and scope of his employment with the City of New Orleans. Lt. Lohman is sued in his individual and official capacity.

12.    Defendant NOPD Captains Robert Bardy and John Bryson are each persons of the full age of majority and upon information and belief residents of the Eastern District of Louisiana. At all pertinent times herein, defendants Bardy and Bryson were Captains of the 5th and 7th NOPD Districts and were responsible for the supervision, monitoring, training, discipline, control and oversight of defendants, Robert Barrios, Ignatius Hills, Mike Hunter, Anthony Villaraso, Robert Faulcon, Kenny Bowen, Robert Gisevius, Arthur Kaufman, M. Lohman, John Does 1-5 and other NOPD officers and employees involved herein. At all times pertinent herein defendants, Bardy and Bryson, were acting under color of law and in the course and scope of their employment with the City of New Orleans. Captains Bardy and Bryson are sued in their individual and official capacities.

13.    Defendant, Deputy David Ryder, is a person of the full age of majority and upon information and belief a resident of St. Landry Parish, Louisiana. Upon

-6-

information and belief he was employed as a deputy with the St. Landry Parish Sheriff's Office and/or Sheriff Howard Zerangue, Sr. At all times pertinent herein he was acting under color of law and in concert and in association with the defendant, City of New Orleans, and the named defendant NOPD officers and John Does 1-5, as well as other NOPD officers and employees. At all pertinent times herein his actions were ratified, condoned and approved of by the co-defendants. He is sued in his individual and official capacity.

## IV.   STATEMENT OF FACTS

14.    Prior to August 27, 2005, 19 year old Jose Holmes, Jr. resided with his grandparents, Richard Green, Sr. and Augustine Green, at 2136 Congress Street in New Orleans, Louisiana. On August 28, 2005 with Hurricane Katrina approaching New Orleans, Jose and his grandmother, Augustine Green left Congress Street and evacuated to higher ground, the Walnut Square Apartment Complex off I-10 Service Road in New Orleans East. Jose remained at that location through the storm which struck the area on August 29, 2005. Present with Jose at that location were numerous relatives which included his Aunt and Uncle, Susan and Leonard Bartholomew, Sr., and their children, Lisha, 18 years old; Leonard, Jr., 15 years old; and Brandon, 8 years old.

15.    On Monday, August 29, 2005 as a result of various levee breaks and the storm surge, their apartment flooded. Jose and his family were able to avoid the flood waters by escaping to the second floor of the apartment. Jose and his relatives

-7-

remained at that location until approximately Wednesday morning, August 31, 2005 when they were rescued by a boat which took them to the area of the Family Inn Motel at 6304 Chef Menteur Highway in New Orleans, Louisiana.

16.    After being dropped off at this location, Jose and his family members made a decision to stay at the Family Inn Motel. They were provided with two rooms by either the owner or manager. Their only other option was to evacuate to the New Orleans Superdome in a truck which periodically transported individuals from this location to the Superdome.

17.    On Friday, September 2, 2005, after running out of food and water, a decision was made by Jose's Uncle, Leonard Bartholomew, Sr., that he and several others, including Jose, would have to cross the Industrial Canal via the Danzinger Bridge on Chef Menteur Highway in order to retrieve food and water. Accordingly, on that date, Jose, his 46 year Uncle, Leonard Bartholomew, Sr., and his 15 year old cousin, Leonard Bartholomew, Jr., crossed the bridge. As the Family Inn Motel is on the north side of the Industrial Canal, these individuals had to walk south, or towards the City of New Orleans. They proceeded on foot over the Danzinger Bridge to Winn Dixie Supermarket where they retrieved water and food. While on the south bank of the Industrial Canal, Jose met a friend, James Barsett, who had been rescued from his flooded home and brought to the area. James returned with Jose and his uncle and cousin to the Family Inn Motel where they dispersed the food and water they were able to carry back. James Barsett spent the next several nights

-8-

in a room at the Family Inn Motel.

18.    On Saturday morning, September 3, 2005, Jose, his cousin, Leonard Bartholomew, Jr., and James Barsett, left the Family Inn Motel and crossed the Danzinger Bridge to once again retrieve food and water for family members, some of whom were now becoming ill.  They again retrieved items from the Winn Dixie on the south bank of the Industrial Canal and returned to the Family Inn Motel on the north bank of the industrial canal.

19.    On Sunday, September 4, 2005 at approximately 9:00 a.m. a decision was again made to cross the Danzinger Bridge to retrieve food and water from the Winn Dixie.  This time James Barsett, Jose Holmes, Jr. and and his Aunt, Susan Bartholomew, Uncle, Leonard Bartholomew, Sr., cousins, 18 year old Leisha Bartholomew and 15 year old Leonard Bartholomew, Jr., left together on foot to cross the Danzinger Bridge.  As their group proceeded south in the roadway of the bridge, at a distance of approximately 50 to 100 yards up the bridge, Jose Holmes, Jr., suddenly and without warning, heard gunfire coming from behind him.  He heard bullets ricocheting around him.  The shots were being fired by a group of heavily armed men dressed in dark clothing who had exited from a truck near the foot of the bridge.  These unidentified men were firing at Jose Holmes, Jr. and his group.

20.    Prior to opening fire on Jose Holmes, Jr., James Barsett, Leonard Bartholomew, Sr., Susan Bartholomew, Leisha Bartholomew and Leonard Bartholomew, Jr., the shooters made no announcements, gave no warnings and

issued no verbal instructions.  There were no markings on the truck or anything to identify these individuals as law enforcement officers.

21.    Instinctively, Jose Holmes, Jr. jumped behind a concrete barricade which protects a pedestrian walkway.  It runs the entire length of the bridge and is located along the shoulder of the southbound lanes of travel.  After jumping behind the barricade, Jose Holmes, Jr. laid in the walkway behind the concrete barrier in an attempt to shield himself from the barrage of gunfire directed towards him and his group.

22.    As Jose Holmes, Jr. laid on the ground defenseless, he was shot multiple times by this group of armed men.  At no time was Jose Holmes, Jr. or anyone in his group armed with any type of weapon or any object that could have been perceived as a weapon.  No one in the group pretended to have a weapon. Jose Holmes, Jr. did not become aware of these armed men until after the armed men fired on him and his group.  As a result of this unprovoked attack by the armed men Jose suffered multiple gunshot wounds, James Barsett was killed, Susan Bartholomew had her arm shot off and Leonard Bartholomew, Sr. and Lisha Bartholomew sustained gunshot wounds.

23.    As Jose laid on the ground after being shot multiple times, he saw and heard a white female police officer advise the other officers to stop shooting Jose and his group.  Shortly thereafter a police officer who was part of the group firing at him earlier stood over Jose, pointed a gun into the region of his abdomen and shot

him two more times.

24.    Jose Holmes, Jr. has learned that the armed group of men who shot at him and his friend and relatives were New Orleans Police Department (NOPD) officers, Sgt. Kenny Bowen, Sgt. Robert Gisevius, Officer Robert Barrios, Officer Ingatius Hills, Officer Michael Hunter, Officer Anthony Villaraso, Officer Robert Faulcon and upon information and belief St. Landry Parish Sheriff Deputy David Ryder.  Upon information and belief there were other officers, John Does 1-5 involved in shooting Jose Holmes, Jr.  The names of these officers are not known at this time but, on information and belief, the officers themselves know of their actions in this incident and their identities are known to the defendant, City, and defendant, NOPD commanders and supervisors named herein.

25.    Although Jose Holmes, Jr. has never been charged with any crime in connection with this incident, a police report describing this incident was prepared on September 4, 2005 by the defendant, Sgt. Arthur Kaufman, which contains information provided by the defendants, Sgts. Bowen and Gisevius, Officers Barrios, Hills, Hunter, Villaraso, Faulcon and Deputy David Ryder. The report bears item no. J-05934-05 and the incident is described as "Attempted Murder of a Police Officer". In the report the plaintiff, Jose Holmes, Jr., is identified as a perpetrator of the attempted murder of the eight named defendants that shot him.  There are three other perpetrators named, one is believed to be the deceased, James Barsett.

26.    After the eight named defendants viciously attacked Jose Holmes, Jr.,

and his group, they realized that these innocent victims were never armed and therefore could not have fired at them, nonetheless the eight named defendants worked individually, together and in concert to concoct a false story. Further, they conspired with one another and other as of yet unknown NOPD police officers or employees of the NOPD to cover up this illegal use of deadly and excessive force. This conspiracy included the making of false statements and reports by all of the eight named defendants which include the claims that Jose Holmes, Jr. had a gun and that he fired at the eight defendants, that there were others on the bridge firing at them and that they witnessed one of the alleged perpetrators discard a gun. Additionally, these eight defendants fabricated evidence, failed to collect or destroyed exculpatory evidence, intimidated witnesses and committed other acts to make it appear that their actions were justified.

27.    After being shot, Jose Holmes, Jr. was transported to West Jefferson Medical Center where he underwent emergency surgery. As a result of the injuries he sustained in this incident, Jose has undergone multiple surgeries and will have to undergo future surgeries. He is permanently injured and disfigured as a result of these injuries. The injuries will reduce his life expectancy.

28.    The eight defendants who accused Jose Holmes, Jr. of attempted murder, i.e., the defendants, Kenny Bowen, Robert Barrios, Ignatius Hills, Mike Hunter, Anthony Villaraso, Robert Falcon, Robert Gesivious and David Ryder, upon information and belief, were members of the group that exited the truck at the foot

of the Danzinger Bridge, were all armed, and all fired their weapons at Jose Holmes,
Jr. with no just or probable cause. Their actions were unreasonable, excessive and
unjustified. Upon information and belief, these defendants were using weapons
which they were not authorized to use and for which they had not been certified or
properly trained.

29.    These defendants, acting individually, together and in concert,  also
participated in a cover-up of the incident described herein and sought to falsely place
blame on Jose Holmes, Jr. in an attempt to coverup their own misconduct and
misdeeds. In conjunction with the coverup of their misconduct and the framing of
Jose Holmes, Jr., the named defendants prepared a false police report, to which the
other officers contributed and/or condoned and ratified, and which defendant Lt.
Lohman approved and ratified.

30.    No criminal charges have been filed against plaintiff, Jose Holmes, Jr.,
by the Orleans Parish District Attorney's office or any grand jury.

31.    Defendants, Sgts. Bowen, Gisevius and Kaufman, are each supervisory
officers with the NOPD, with the rank of Sargeant at all relevant times described
herein. They each abdicated their responsibilities to properly supervise Officers
Faulcon, Hunter, Hills, Vallaraso, Barrios and Ryder who were under their command
and instead participated in acts of misconduct and  ratified and condoned the
misconduct of the other defendant officers. In addition, defendant Kaufman falsified
and approved the preparation and filing of a false police report, as did defendant Lt.

Lohman.

32.    As part of the conspiracy to portray Jose Holmes, Jr. as one of the perpetrators of the attempt murder on a police officer, defendant David Ryder falsely identified another individual as being part of Jose Holmes, Jr.'s group and as having fired a gun at him. In fact, David Ryder has a criminal record, was not a reliable or trustworthy individual or source, and was lying. The defendant NOPD officers and supervisors knew, must have known or should have known that Ryder was lying; yet failed to take any appropriate or necessary action and subsequently accused Jose Holmes, Jr., his deceased friend, Joseph Barrett, and others of attempt murder.

33.    During the time of this incident, the New Orleans Police Department was in a state of collapse, due to the failure of leadership and actions of the defendants Mayor Nagin and then NOPD Superintendent Eddie Compass. Despite ample forewarning and information, these defendants failed to properly plan or to insure the execution of those plans which did exist, to protect the citizens of New Orleans, their persons, their properties, including the plaintiff herein, from harm due to natural or human elements in the midst of a major hurricane event occurring in the City of New Orleans.

34.    Defendants Nagin, Compass and Riley failed to insure that the City, its citizens and its police department were adequately prepared to respond to such an event and instead allowed officers and supervisors of the NOPD to operate with virtually no oversight or accountability, suspended or eliminated policies, procedures

and practices which should have provided checks and balances and control over the police department, and instead of providing calm leadership and direction, were themselves the sources for numerous false and hysterical reports to the media and others, which contributed to the disorientation and dislocation of the police department during this time of crisis. They failed to take appropriate steps to provide adequate security, shelter, transportation, food, water or medical care for the citizens of the City, including its police officers. They failed to prevent or curtail looting, thereby endangering the lives of many innocent citizens and permitting the City to descend into widespread lawlessness, and failed to insure that there was adequate communication and co-ordination among law enforcement and rescue agencies and individuals.

35.    Defendants Nagin, Compass, Riley, Bryson and Bardy knew, must have known or should have known that the department's infrastructure and command structure had collapsed and was no longer operational. They were also aware that many officers were mentally, emotionally and physically exhausted and on the verge of collapse. They permitted officers, including those who were not fit for duty, to obtain and use non-departmental approved weapons and essentially ceased to exercise any meaningful control or supervision over officers or lower-level supervisors, including those named as defendants herein. They were also aware that a well-known 7th district officer, in the midst of this chaos and devastation, had committed suicide, an event which was extremely traumatic and upsetting to fellow

officers, especially those assigned to the 7th District and those who knew this officer. The defendants failed to insure that officers who were emotionally, mentally or physically disabled or impaired, were relieved of duty and their weapons.

36.    Instead, defendants Nagin, Compass and Riley contributed to the atmosphere of lawlessness and collapse of discipline and accountability in the department, by urging, encouraging and pushing NOPD officers to "take back" the City by any means necessary, including the use of excessive and unlawful force, if needed. Rather than take meaningful measures to restore the command structure and discipline and accountability in the department, they communicated, directly or indirectly, to officers under their command, that violations of law and of citizens' rights would be tolerated, condoned and excused during this crisis, resulting in the terrible consequences to innocent people which occurred in this event.

37.    On information and belief, defendants, Nagin, Compass, Riley, Bardy and Bryson communicated, directly or indirectly, to those persons under their command, including the defendants herein, that the protections and guarantees of the U.S. Constitution no longer applied and that officers were authorized to "shoot to kill" individuals in circumstances and under conditions and standards which were constitutionally deficient. These defendants knew, must have known or should have known, that such a policy, practice or custom would lead to violations of citizens' fundamental constitutional rights and would result in harm to innocent citizens but they proceeded nevertheless. The defendants acted with a conscious disregard of

a substantial risk of harm to innocent parties.

38.    This collapse of the NOPD had its roots in the failure of leadership of then Superintendent Compass. Almost from the beginning of Compass' regime as police chief, he made it clear that the discipline, accountability and oversight which had been a major goal of his predecessor, former Superintendent Richard Pennington, would no longer be the case. Defendants, Nagin and Compass, were well aware of the history of the NOPD and its severe deficiencies and dysfunctions in hiring, supervision, discipline and investigation and handling of incidents involving mistreatment and abuse of citizens for a period of many years, yet failed to take reasonable or meaningful steps to control these abuses or take corrective action.

39.    Instead, defendant Compass, as Superintendent of Police, failed to insist upon accountability and discipline of officers under his command and communicated, directly or indirectly, pre-Katrina, to NOPD  commanders, supervisors and police officers, particularly those dealing directly with citizens through task force or "jump out" or street units, that complaints by citizens of mistreatment by officers would not be seriously investigated and that officers would be largely free of consequence and accountability for violation of citizens' rights and could conduct themselves accordingly, thereby allowing the department to return, once again, into a culture where violence and mistreatment of citizens was condoned.

40.    On information and belief, the defendant officers and supervisors

named herein, had also been involved in other incidents relating to the violation of the rights of residents and visitors to the City, with no appropriate investigation, discipline, accountability, or consequence thereto, which was known, must have or should have been known to the other defendants herein yet defendants likewise approved of, ratified and condoned these actions.

41.    On information and belief, defendant Compass, pre-Katrina, with the concurrence and approval of Nagin, set the tone and direction for numerous incidents of police harassment and interference with protected rights which were occurring throughout the City, by approving, ratifying and condoning actions by NOPD officers who were engaged in violating citizens' rights and by communicating, directly and indirectly, to police officers, supervisors and commanders that he would see to it that they would be protected from discipline or accountability if they were charged or accused of misconduct towards residents of the community while carrying out unlawful harassment and interference. Many of the essential reforms of the historically troubled NOPD which had been instituted under the administration of former Superintendent of Police Richard Pennington to insure police accountability and to protect citizens against violation of their rights by police misconduct, were eliminated or significantly curtailed or seriously deteriorated under the administration and leadership of defendant Compass, the effect of which was to discourage citizens from filing complaints or seeking redress for the violation of their rights and also to embolden officers engaged in inappropriate conduct.

-18-

42.    Going into the storm, the relations between the NOPD and the community it was to protect and serve, had badly deteriorated and the issue of police mistreatment of residents of the City had become an issue of public concern. The Public Integrity Bureau had become unresponsive to citizen complaints and discipline, accountability and professionalism of the department had badly deteriorated.

43.    Defendant Nagin and Compass knew, must or should have known that the ultimate responsibility to provide proper leadership and to insist upon discipline, accountability, respect and protection for the rights of citizens, was the duty of the Superintendent of Police and that the failure to insist upon upholding professional standards and protection for the constitutional and civil rights of civilians by police officers could and would have enormous detrimental consequences for the citizens of New Orleans, as well as the police department and the City as a whole. Instead of insisting upon upholding and enforcing these principles and standards, defendant Compass took actions, directly and indirectly, to excuse and condone misconduct by his subordinates, and failed to exercise control or discipline over police officers, their supervisors or his command staff. As a result, those NOPD personnel inclined to do so were able to abuse residents and visitors to the City of New Orleans, with virtually no disciplinary action or accountability for acts in violation of law, regulations and professional police standards and practices. Under the leadership of defendant Compass, abuse and deliberate disregard of citizens' rights by NOPD personnel was

widespread, with little or no accountability and a resurgence and re-emergence of a culture of violence and disregard towards citizens' rights was allowed to flourish.

44.    On information and belief, defendant Nagin was aware or should have known of the serious problems with the police department and with defendant Compass' leadership, or lack thereof, but failed to take any reasonable or necessary steps, pre-Katrina, to address these problems, with the foreseeable result of the department's collapse during a time of extreme crisis.    This collapse was foreseeable and is causally related to the incident described herein.

45.    As a result of the actions of the defendants described herein, Jose Holmes, Jr. experienced and continues to experience past, present and future terror, mental anguish, emotional and physical pain and suffering, loss of enjoyment of life, permanent disfigurement, permanent disability, a shortened life expectancy, past, present and future lost wages, past, present and future medical expenses, loss of reputation, and psychological injury.

46.    All of the actions by the defendants described herein took place under color of law and within the course and scope of their employment with the City of New Orleans.

## V.    CAUSES OF ACTION

47.    Plaintiff re-alleges paragraphs 1-46.

48.    The actions of the defendants, Ryder, Barrios, Hills, Hunter, Villaraso, Faulcon and Sgts. Bowen, Gisevius and Kaufman, in assaulting, seizing, using

-20-

excessive force, illegally shooting, injuring and attempting to frame Jose Holmes, Jr. for crimes which he did not commit, violated the rights of Jose Holmes, Jr. as guaranteed under the First, Fourth, Ninth and Fourteenth Amendments to the United State Constitution, to privacy, to liberty, to be left alone, to locomotion, to travel, to due process, to be free from unreasonable search and seizure, and to be free from the unjustifiable and excessive use of force, all in violation of 42 U.S.C. 1983.

49.    The defendants, acting together and under the color of law, reached an understanding, engaged in a course of conduct and otherwise conspired among themselves to commit those acts described herein and to deprive Jose Holmes, Jr. and others of their constitutional rights as set forth herein.

50.    The defendants Nagin, former Superintendent Compass, Deputy Chief Riley, Captains Bardy and Bryson, Lt. Lohman, and Sgt. Kaufman, had knowledge of the wrongs done and conspired to be done as described herein, had the power to prevent or aid in the prevention of same, yet failed or refused to do so in violation of 42 USC 1983.

51.    The City of New Orleans had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so, in violation of 42 USC 1983.

52.    The City of New Orleans has developed and maintained policies, customs and practices exhibiting deliberate indifference to the constitutional rights of individuals in the City of New Orleans, which caused the violation of plaintiff's rights

-21-

as described herein and the resultant damages suffered. These policies, customs and practices include the following:

1.  Failing to properly screen before hiring and failing to properly supervise, discipline, train or control  police officers and supervisors under its jurisdiction and control, including the defendant officers, supervisors and commanders.

2.  Failing to provide adequate or reasonable supervision, discipline, monitoring or control of officers or supervisors prior to and during the aftermath of the effects of Hurricane Katrina,  including the defendants herein, so that officers' conduct and treatment of citizens and visitors to the community, was not adequately monitored or supervised, there was no meaningful evaluation or scrutiny regarding the treatment of citizens by officers and supervisors were not held accountable for the action of their subordinates.

3.  Failing to adequately or properly investigate allegations of misconduct and/or violations of law by police officers, supervisors or commanders or to properly initiate or conduct investigations of officers, supervisors or commanders suspected of misconduct and/or violations of law and instead tolerating the misconduct and mistreatment of citizens, including the actions of defendant officers, supervisors and commanders.

4.  Failing to take reasonable and necessary steps to properly investigate, charge, maintain and defend disciplinary action for misconduct against officers, supervisors or commanders, so that disciplinary investigations and actions, when taken, are frequently sabotaged and undermined, with the result that they are frequently abandoned, reduced or lost on appeal with a corresponding decay and decline in professionalism, accountability and discipline in the police department, to the detriment of the civil rights of residents and visitors to the City.

5.  Failing to keep accurate and reasonable records of incidents involving allegations of police misconduct and the investigation, handling and resolution of those incidents, in order to avoid public scrutiny and accountability as to the extent of the misconduct and the inability of the department to police itself.

-22-

6.    Failing to conduct appropriate in-service training, re-training or enhanced supervision of officers who were known or believed or suspected to have engaged in misconduct but for whom disciplinary action was not available for whatever reason.

7.    Failing to reasonably or appropriately monitor civil litigation or police misconduct revealed through criminal proceedings so as to take corrective and/or disciplinary action when necessary, including the actions of the defendant officers, supervisors and commanders.

8.    Failing to keep accurate or easily accessible records of the amount of money spent by the City in defending, settling and paying judgments in litigation involving misconduct by police personnel, so as to avoid accountability and scrutiny of the extent of the problem of police misconduct.

9.    Failing to properly operate, maintain and staff an adequate "early warning system" to flag police personnel for whom there is concern regarding improper behavior or violation of citizens' rights or emotional or psychological conditions which could lead to violation of citizens' rights and to institute appropriate monitoring, supervision, training or intervention regarding said officers.

10.    Failing to properly operate, maintain and staff an adequate internal investigative agency to identify, investigate and take appropriate action against police personnel when there is available information indicating the officer has violated a citizen's rights or otherwise engaged in misconduct, including but not limited to failing to keep adequate or reasonable records of citizen calls and complaints, failing to conduct meaningful investigation or analysis of patterns of misconduct, failing to conduct pro-active investigations or other appropriate or reasonable measures to protect citizens from abuse of their rights by police officers.

11.    Authorizing, permitting, ratifying and condoning policies, practices, customs and procedures whereby police officers and supervisors who were operating under extremely stressful circumstances during the aftermath of Hurricane Katrina, were

        A.    permitted to operate on their own, with virtually no communication, supervision or oversight;

B.    permitted to use weapons which were not departmental approved and for which the department had failed to establish any oversight or control;

C.    permitted to suspend or ignore standard operating procedures for police work, i.e., preserving and gathering evidence;

D.    permitted to engage in unlawful activities; and

E.    permitted to continue to work as police officers even though they were emotionally and mentally unfit for duty.

12.    Condoning, approving and authorizing a culture and environment within the NOPD in which NOPD personnel, including the defendants herein, had the reasonable belief or expectation that their actions would not be properly monitored by supervisory or command officers and that their misconduct and/or unlawful actions would not be thoroughly investigated or sanctioned, but would be approved and tolerated.

13.    Failing to adequately hold supervisory or command officers responsible for misconduct of their subordinates.

14.    Failing to have adequate and reasonable plans to protect its citizens during foreseeable hurricanes.

53.    The actions and omissions of the defendants as described herein were done with deliberate indifference to the constitutional rights of the plaintiff. The defendants have acted maliciously, willfully, wantonly, and in reckless disregard of plaintiff's rights.

54.    The acts and omissions of the defendants as described herein were also done with negligence, gross negligence and/or intent, in violation of Louisiana statutory and constitutional law and, with regard to Jose Holmes, Jr. constituted assault, battery, false arrest, false imprisonment, intentional infliction of emotional

-24-

distress, slander and criminal conspiracy and violation of the rights to privacy, to liberty, to be left alone, to locomotion, to travel, to due process, to be free from unreasonable search and seizure, and to be free from the unjustifiable and excessive use of force under state law.

55.    The defendant City of New Orleans negligently hired, retained, supervised, failed to discipline and entrusted the defendants in violation of Louisiana law.

56.    The acts and omissions of the defendants as described herein were within the course and scope of their employment and the City of New Orleans is vicariously liable for their acts and omissions in accordance with Louisiana law.

57.    The defendants are jointly and severally liable for the wrongs complained of herein, either by virtue of direct participation or by virtue of encouraging, aiding, abetting, committing, and/or ratifying or condoning the commission of the above described acts and/or omissions.

58.    The actions of the defendants as described herein, were the proximate cause of the damages suffered by plaintiff.

## VI.    DAMAGES

59.    As a result of the actions of the defendants as described above, damages have been incurred, as follows:

1.    Jose Holmes, Jr., suffered past, present and future: physical pain and suffering, mental anguish and emotional pain and suffering, permanent

-25-

disability, disfigurement, loss of reputation, lost earnings, lost earnings

potential, past, present and future medical expenses, and shortened life

expectancy.

2.      Punitive damages against the individual defendants are sought.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff pray that after due proceedings, there be judgment in

their behalf and against all defendants, jointly, severally and in solido, as follows:

1.      Compensatory and punitive damages on behalf of plaintiff.

2.      Past, present and future medical expenses.

3.      That plaintiff be awarded reasonable attorneys fees and all costs of

these proceedings.

4.      That judicial interest be awarded from the date of judicial demand.

5.      That this matter be tried by a jury.

6.      All other relief that this Court deems just and proper.

Respectfully submitted;

**PIERCE & BIZAL**

*Gary W Bizal*

**GARY W. BIZAL** (La. Bar No. 1255)
639 Loyola Avenue, Suite 1820
New Orleans, Louisiana 70113
(504)525-1328 Telephone
(504)525-1353 Fax
Attorney for Plaintiff

-26-